[No. 20301. Department One. March 3, 1927.]

LYDIA NELSON *et al., Respondents,* v. G. L. STANDRING *et al., Appellants.*[1]

[1] DAMAGES (81)—EXCESSIVE DAMAGES—INJURY TO SPINE. A verdict for $4,375, for injuries to the spine, will not be set aside as the result of passion or prejudice, where the evidence of plaintiff and two physicians, not contradicted, given eighteen months after the accident, indicated a fracture of the fifth lumbar, which was serious, painful and liable to be permanent, affecting the plaintiff's ability to work, and on a previous trial, the jury had rendered a verdict for $3,000 and plaintiff had submitted to a new trial rather than accept a reduction to $750.

[2] TRIAL (101)—INSTRUCTIONS—REQUESTS—ALREADY GIVEN. It is not error to refuse requested instructions covered in the general charge.

Appeal from a judgment of the superior court for King county, Stern, J., entered June 9, 1926, upon the verdict of a jury in favor of the plaintiffs in an action for damages resulting from a collision of motor vehicles. Affirmed.

*Ralph S. Pierce,* for appellants.

*Christopher Jacobsen,* for respondents.

MAIN, J.—This action was brought to recover for personal injuries suffered by the plaintiff Lydia Nelson, who will be referred to as though she were the only

[1]Reported in 253 Pac. 814.

party on that side of the controversy, while a passenger on an automobile stage operated between Auburn and Seattle by the defendant G. T. Standring, who will be referred to as though he were the only defendant. The cause was tried to the court and a jury and resulted in a verdict in favor of the plaintiff in the sum of $4,375. Motion for a new trial being made and overruled, judgment was entered upon the verdict, from which the defendant appeals.

The facts essential to be stated are these: On August 15, 1924, the respondent, together with her husband and their minor son, took the stage at Auburn to go to Seattle. While on the way, the driver of the stage pulled to the left to pass a Ford coupe in front and as he did so saw a vehicle approaching from the opposite direction. In attempting to get back on the right hand side of the road, the stage collided with the Ford coupe, with the result that the coupe went into the ditch at the side of the road and the front end of the stage also went into the ditch. When the respondent became aware that an accident was inevitable, she fainted. After the stage went into the ditch, she was found between two seats with her back resting on an automobile jack. Her husband to extricate her from this position was required to get assistance. She regained consciousness after being removed from the stage. In the course of a half an hour or so, the parties resumed their journey to Seattle, and after reaching there the respondent walked several blocks where she and her husband signed the necessary papers for the purchase of a small restaurant. They then went by street car to the location of the restaurant and took charge. As a result of the accident, the respondent's left ankle was sprained and the swelling thereof extended to the knee. Her back was also injured, and from both injuries she

suffered pain and continued to suffer, especially from the back, until the time of the trial, which occurred more than eighteen months after the accident.

[1] The principal objection which the appellant presents upon this appeal is as to the size of the verdict. It is contended that it is the result of passion and prejudice and that a reduction should be ordered or a new trial granted. In this connection, much is made of the fact that, subsequent to the injury, the respondent worked in the restaurant for six or seven weeks before it was sold. Thereafter she worked for a time in a butter stall at the public market, and later did work in two or three hotels. She testified that she was unable to do full work on account of the condition of her ankle and back. For a number of months, after ceasing to work at the last hotel where she was employed, she worked two hours on Saturday and one on Monday in a stall at the public market. She at no time was in the hospital or confined to her bed in her home. Prior to the accident, she was a strong, healthy and energetic woman. The fact that she, after the accident, continued to work to the extent of her ability and at no time was sent to the hospital or confined to her bed on account of the injury, does not necessarily show that the verdict was excessive.

To determine whether the verdict is excessive, two major facts are necessary to be considered: First, what was the condition of the respondent at the time of the trial; and, second, was that condition proximately produced by the accident. Upon the trial, an X-ray picture of the respondent's back taken a day or two before was produced and the evidence of two doctors was taken. One doctor had treated her from the time of the injury until approximately the time of the trial. It is true that, after the accident, the respondent did

not go to see the doctor until some time in September. As to her condition at that time the doctor testified:

"I found a swollen, painful ankle and a very painful back. It troubled her a great deal to walk about, both from the pain in the back and in the ankle. She reported it came on following an accident."

As to the condition of the ankle at the time of the trial, this doctor testified:

"Her ankle is in pretty good condition. She had a sprain and probably, as the X-ray showed, a splinter broken off the lower end of the fibula, which is one of the bones that join in the formation of the ankle joint, just to the outside of the ankle joint. Q. Is that condition of the ankle one that is liable to cause her any difficulty in the future? A. Not a great deal. It is a little larger than the other, but not much. Most sprains with a small fracture at the joint usually leave it a little bit larger, and occasionally there is a little pain in the ankle, especially when exposed to cold."

As to the condition of the back at the time of the trial, the doctor testified:

"The X-ray showed a fracture of the transverse process of the fifth lumbar. Q. Speaking in common. ordinary language, what would you say that would be? A. It is a fracture of the process that extends to the side from one of the vertebra, from the spine; the fifth lumbar is low down, near the coccyx, in fact it is the one that rests upon the sacrum—not coccyx, but the sacrum, I should say. Q. At the very lower end of the spine? A. It is the lower one of the spine, the lower vertebra. Between each of the five lower vertebra there is an arthritis, and between the second and third there is a lipping off of the surface, almost like a chicken's beak, showing an overgrowth of bone. Q. In examining Mrs. Nelson this last time, was she sore to the touch? A. The sacroiliac joint and the lower spine are very tender. Q. In your judgment, what is the future prospects for the healing of that injury to the back? A. The recovery of arthritis is rather indefinite. She may have a per-

manent arthritis in the lower vertebra. Q. Such a sprain as you speak about, taken into account with the fact that it has lasted this length of time, is that one that is liable to be of a permanent nature, or not? A. Well, the longer the time that elapses before recovery the less chance there is of a permanent recovery. Many of these arthritis cases never recover. We find many joint cases with arthritis that are permanent.''

The other doctor was a specialist in orthopedic surgery, and had no acquaintance with the case until he examined the respondent a few days prior to the trial. As to the condition of the back, he testified:

''My examination was principally confined to the back, of which she was complaining. On standing, she showed a curvature of the lower spine to the left and also the angle of the lower part of the spine seemed to be somewhat increased forward. There seemed to be some shortening of the lumbar spine, that is the distance between the ilium or what is called the hip bones, and the lower ribs seemed to be decreased. There was limitation of motion, on bending in all directions, of the lower part of the spine, especially forward to the right. She complained of pain in this same region in the lower part of the spine and also the region between the hip joints. She was tender over the same region, over what we call the lower lumbar spine, and over the muscles to the right, and also what we call the sacroiliac joint, which is the joint between the hip joints and the spine.''

Referring to the condition as shown by the X-ray plate, he said:

''We never see that in that position, except following an injury of some sort, and we feel that possibly was fractured and then healed in that position.''

He further testified:

''The condition you found in Mrs. Nelson, was that a condition that could come from injury so sustained? A. This small process that has apparently been broken,

could be caused by such an injury, and the over-growth of the bone there usually follows some injury. Q. What is the possibility of a recovery in cases of this kind? A. A condition showing as extensive changes as this showed in the X-rays, we do not expect them to get entirely well, but expect them to be left with some disability."

The appellant not having offered any testimony to combat that offered by the respondent, the case must be determined largely from the testimony of the respondent herself and the two doctors produced by her. At the time of the trial, the result of the injury to the ankle does not appear to have been serious, but the result to the back, as indicated by the testimony of both doctors, was serious, painful and likely to be permanent.

The fact that, upon a former trial, the jury returned a verdict for three thousand dollars and the trial judge in that case granted a new trial because the respondent would not accept a judgment for seven hundred fifty dollars, does not show that the larger verdict upon the last trial was so large as to be the result of passion and prejudice on the part of the jury. What the evidence may have been upon the first trial, we do not know. It does appear that, upon the second trial, the X-ray picture was produced for the first time, as well as the testimony of the doctor who specialized in orthopedic surgery. Whether a verdict is so large as to indicate passion and prejudice must be determined largely by the particular facts in the case. After giving careful consideration to all of the evidence relative to the extent of the injury, we are unable to say, even though the verdict may seem large, that there was passion and prejudice on the part of the jury.

[2] The appellant also objects to two instructions given by the court, neither of which is technically

accurate.   The particular objection to the instructions is that in neither of them was the jury told that, before there could be a recovery, the negligence of the defendant must have proximately caused the injury and must have been such that but for it the accident would not have happened.   In subsequent instructions both of these matters were distinctly covered, and when the instructions are read as a whole it is clear that the two instructions complained of could not have misled the jury.

The judgment will be affirmed.

FULLERTON, MITCHELL, ASKREN, and FRENCH, JJ., concur.